**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TYSON DAVID O'NEAL,

                Petitioner,              Case Number: 06-12307
                                        HON. AVERN COHN

v.

BLAINE LAFLER,

                Respondent.

_____/

**MEMORANDUM AND ORDER
GRANTING CONDITIONAL WRIT OF HABEAS CORPUS**

> Though the mills of God grind slowly, yet they grind exceeding small;
> Though with patience he stands waiting, with exactness grinds he all.[1]

---

[1] Henry Wadsworth Longfellow, 1845, "Retribution," in <u>The Belfry of Bruges and Other Poems</u>, collected in 1870 Longfellow Poems (1960 edition) 331.

## I.  Introduction

This is a habeas case under 28 U.S.C. § 2254.  Petitioner Tyson David O'Neal (Petitioner) is a state inmate at the St. Louis Correctional Facility in St. Louis, Michigan. Petitioner filed a pro se petition for a writ of habeas corpus challenging his convictions for second-degree murder, felon in possession of a firearm, and felony firearm.  The petition raises multiple claims.  Respondent, through the Attorney General's office, filed a response, arguing that all of Petitioner's claims are procedurally defaulted and/or without merit.

Of the many claims presented in the petition, one has merit.  The Court finds that the trial court's exclusion of certain testimony violated Petitioner's right to present a defense and that the state court's holding to the contrary is an unreasonable application of Supreme Court precedent.  The error was not harmless.  Accordingly, the grants a conditional writ of habeas corpus.

## II.  Background

### A.  Facts

Due to the nature of the claim upon which the writ is being granted, a detailed recitation of the facts is necessary.  The following is gleaned from the state court record.

Petitioner's convictions arise from the shooting death of Gene Shelby outside a gas station in the City of Detroit on January 23, 2001.  The shooting followed an argument between Gene Shelby and Parish Hickman.  It was the prosecution's theory that, after Shelby and Hickman argued, Hickman returned to the driver's side of his vehicle and that Petitioner, who had been seated in the passenger side of the vehicle,

opened the passenger door, and fired a rifle at Shelby, striking him in the shoulder. Shelby later died at the hospital after suffering a heart attack.  Petitioner maintained that Hickman was the shooter and Petitioner was just exiting the gas station when the shots were fired.

At the time of his death, Gene Shelby was a member of the Sons of Zodiac Motorcycle Club.  On the day of his death, Shelby went to buy supplies for the motorcycle club along with four other club members: Henry Patterson (known as "Little Stone"), Edward Clark, Shakir Azeem (known as "Worm"), and a man known only as "Bruno".  The men stopped at the gas station to purchase lottery tickets.  Shelby pointed out to Edward Clark that Parish Hickman pulled up to a nearby gas pump.  Shelby expressed concern to Clark about Hickman because the two had apparently had a previous dispute.  Hickman drove away after getting gas and Clark told Shelby that it seemed there would be no conflict.  After the men purchased their lottery tickets, they were in the parking lot talking, when Hickman drove back into the parking lot at a high speed.  Hickman exited the car and called Shelby over to talk to him.  The discussion became heated.  Eventually, Hickman walked back to his vehicle.  He said something or gestured to the person sitting in the passenger seat then walked toward the back of his vehicle and toward the driver's side.  The passenger door opened and several witnesses testified to seeing an AK-47-type gun come from that side of the car and fire several shots toward Shelby.  Shelby was struck in the arm.  Ultimately, he died in the hospital from the gunshot wound and complications from a preexisting heart condition.

Parish Hickman was known to police immediately after the shooting as one of the suspects.  He fled the country and was arrested approximately one year later.  At that

time he provided police with Petitioner's name.

Four witnesses (Dorshell Wilkerson, Edward Clark, Jr., Henry Patterson, and Shakir Azeem) testified that the gunshots came from the passenger side of Hickman's vehicle. Three witnesses (Clark, Patterson, and Azeem) identified Petitioner in a lineup as the shooter. Wilkerson was unable to identify anyone. Patterson's identification of Petitioner was contradicted by the testimony of Detroit police officer Curtis Johns, who responded to the shooting. Officer Johns testified that he interviewed Henry Patterson at the scene shortly after the shooting. Patterson told Officer Johns that Parish Hickman was the shooter.

Shakir Azeem testified that after the shooting he drove Shelby to the hospital. On the way to the hospital, Shelby said, "Parish has shot me." See Doc. 14-3, Pg. ID 528.

Parish Hickman testified for the prosecution pursuant to a plea agreement which allowed him to plead guilty to manslaughter and provided for a sentence of three to fifteen years in exchange for his testimony at Petitioner's trial. Hickman testified that on the day of the shooting he was at the gas station in his black Chrysler 300M with Petitioner riding as a passenger when he saw Gene Shelby in a vehicle at an adjacent pump. Hickman was frightened because he saw that Shelby was there with a motorcycle gang and he and Shelby previously had disputes. Hickman quickly ran to a friend's house near the gas station, retrieved mace and returned to the gas station where Shelby and his friends remained. Hickman got into his vehicle and left. Hickman drove to the same friend's house and retrieved an assault rifle. He placed the gun between the two front seats. Petitioner remained in the car while Hickman retrieved the

4

gun.  According to Hickman, Petitioner was high on heroin.   Hickman drove back to the gas station with the intention of confronting Shelby.  He and Shelby exchanged words. Hickman invited Shelby to fight him but Shelby did not take the bait.  Ultimately, Hickman walked toward his vehicle.  He told Petitioner to "handle his business" or "handle your business."   <u>See</u> Doc. 14, Pg. ID 674-75.  It is unclear from his testimony exactly what Hickman meant by this.  Hickman testified that he thought Petitioner would walk home from the gas station, but it is unclear why he thought Petitioner would exit the vehicle and walk home.  Hickman testified that as he walked to the driver's side door, he was startled by Petitioner opening the passenger side door, and firing the assault rifle.  After the shooting, Hickman retained a lawyer and fled the country.

Defense counsel attempted to confront Hickman with a statement he allegedly made to Deandre Wilson while the two were incarcerated at the same facility.  Deandre Wilson gave a statement to a defense investigator in which he stated that Hickman told him that Hickman had gotten away with shooting someone, gotten three to fifteen years and was planning to frame Petitioner for the shooting.  The trial court found the statement inadmissible because defense counsel failed to timely inform the prosecution about the statement.

Twana Hickman, Parish Hickman's estranged wife, testified that sometime after 7:00 p.m. on the night of the shooting, Parish called her and asked her to come to his sister's home to pick him up.  Twana went to the home and picked up Petitioner and Parish.  They returned to her home where both men stayed for a while before leaving.

The defense called five witnesses.  The first two witnesses, Officer Pride Johnson and registered nurse Earl Rupert, were called to offer testimony that, in

response to a question from Officer Johnson, Gene Shelby stated, "Parish shot me."
The trial court sustained the prosecutor's hearsay objection.

Denise Hicks testified that she was at the gas station on the night of the shooting.
She saw Petitioner, who was her friend's fiancee, inside the gas station and began
talking to him.  She and Petitioner exited the gas station together.  When they did so,
she saw a tall man with something in his hands and then heard gunshots.  Petitioner
was standing next to her when the gunshots were fired and they both dropped to the
ground.  When the gunshots stopped, she raced to her vehicle.  Petitioner fled in the
opposite direction.  On cross-examination, Hicks testified that, although she knew
Petitioner had been charged with murder, she did not attempt to contact police or the
prosecutor to share what she had seen on that night.

Anita Robinson, Petitioner's fiancee, testified that during the early evening hours
of January 23, 2001, she received a phone call from Petitioner.  In response to the
phone call, she went to pick Petitioner up at a gas station.  She dropped him off at his
mother's house.

Petitioner testified in his own defense.  He testified that on January 23, 2001, he
and Hickman had just finished cleaning some houses when Hickman stopped at a gas
station.  While Hickman was pumping gas, Petitioner went into the station to buy
cigarettes.  Inside the station, he began chatting with Denise Hicks.  He noticed
Petitioner drive away from the station.  As Petitioner was leaving the station, he noticed
Hickman had returned.  He saw Hickman with a gun in his hand and heard gunshots.
After firing the shots, Hickman threw the gun to someone seated in the passenger seat
of Hickman's vehicle and drove away.

6

## B.  Procedural History

Following a jury trial in Wayne County Circuit Court, Petitioner was convicted of second-degree murder, M.C.L. § 750.317, possession of a firearm during the commission of a felony, M.C.L. § 750.227b, and possession of a firearm by a person convicted of a felony, M.C.L.§ 750.224f.  On December 9, 2002, he was sentenced as a fourth habitual offender to 36 to 80 years for the second-degree murder conviction, 28 months to 5 years for the felon-in-possession conviction, and 2 years for the felony-firearm conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals, presenting these claims:

I.   Trial Court Evidentiary Error, Infringing the Fourteenth Amendment Right to Due Process.

      A.   Where no discovery order directed the defense to make disclosures to the prosecution and, the prosecution made no request for disclosure, did the trial court erroneously preclude the defense from confronting Parish Hickman with his statement admitting that he had gotten away with murder by framing Tyson O'Neal?

      B.   Did the trial court err by precluding the defense from presenting the testimony of Sgt. Johnson and Nurse Rupert that Gene Shelby said, "Parish Hickman shot me?"

II.  Prosecutorial misconduct

      A.   By arguing that "At 32 I've done just a few too many of these case," did the prosecutor improperly inject issues broader than the guilt or innocence of the accused?

      B.   Did the prosecutor improperly vouch for the credibility of his witnesses when he told the jury that these witnesses were honest?

III. Ineffective assistance of counsel

      A.   Defendant was charged as a felon in possession of a firearm. While

instructing prospective jurors in this murder prosecution, the trial court told the jury that defendant "Had been convicted of manslaughter, a specified felony." Was trial counsel ineffective by failing to move *in limine* to bar admission of the details of defendant's prior conviction and by failing to move for a new jury panel?

B.   Was trial counsel ineffective for failing to move for a mistrial or, alternatively, requesting a cautionary instruction when Parish Hickman non responsively stated that he had passed a polygraph examination?

C.   Was trial counsel ineffective for failing to seek the appointment of an expert on eyewitness identification and/or an instruction on the grave dangers of eyewitness misidentification based on People v Franklin Anderson?

D.   Was trial counsel ineffective in failing to timely and properly object to the prosecutorial misconduct raised in Issue II of this Brief?

The Michigan Court of Appeals affirmed Petitioner's convictions.  People v. O'Neal, No. 247133 (Mich. Ct. App. Sept. 16, 2004).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, presenting the same claims presented to the Michigan Court of Appeals.  The Michigan Supreme Court denied leave to appeal.  People v. O'Neal, 472 Mich. 915 (Mich. May 31, 2005).

Petitioner filed a habeas corpus petition in this Court, raising the same issues raised on direct appeal.  After Respondent filed an answer in opposition, Petitioner moved to stay the case to allow him to raise additional, unexhausted claims in state court.  The Court granted the motion and administratively closed the case.  See 12/6/07 Order, Doc. 21.

Petitioner filed a motion for relief from judgment in the trial court, raising these claims:

I.    Defendant was denied his state and federal right of confrontation when no proof was offered at trial to show that Medical Examiner, Dr. Cheryl Loewe, was unavailable to testify and defendant did not have a prior opportunity to cross-examine her, but hearsay evidence was admitted through Dr. Sawait Kanluen's testimony regarding the contents of Loewe's autopsy report (and addendum) and notes which amounted to "testimonial" evidence as defined in Crawford v. Washington.

II.   Trial counsel was ineffective when he failed to present any medical experts on arteriosclerotic cardiovascular disease or an enlarged heart, and failed to call as witnesses medical personnel from the hospital.

III.  Defendant was denied his State and Federal constitutional right to the effective assistance of counsel where counsel failed to object to the trial court's exclusion of potentially exculpatory evidence and allowed the court to exclude other exculpatory statements from promising witnesses.

IV.   Defendant improperly sentenced as a fourth habitual offender.

V.    Appellate counsel was ineffective in failing to raise on direct appeal the claims raised in the motion for relief from judgment.

VI.   Defendant was denied the effective assistance of trial counsel, where counsel failed to move to suppress the identification testimony of key prosecution witness Edward Clark, Henry Patterson, and Shakir Azeem, as the result of an unduly suggestive line-up, where the defendant at 5'6", was not only considerably shorter but also the only dark complected participant.

VII.  Defendant O'Neal was denied his constitutional right to the effective assistance of counsel where trial counsel failed to interview and produce at trial Shannon Coleman who was an eyewitness to the shooting incident, and only attempted to secure his presence just prior to the prosecution's closing argument.

The trial court held that the judgment of sentencing incorrectly indicated that Petitioner was sentenced as a fourth habitual offender, rather than as a second habitual offender.  See 1/21/09 Op. & Ord., Doc. 30-4.  Pg. ID 1279-1282.  The trial court held that a corrected judgment of sentence would be sent to the Department of Corrections and found no resentencing was required because the error was only a typographical

9

one.  In all other respects, the trial court denied the motion for relief from judgment.  Id.

Petitioner filed an application for leave to appeal in the Michigan Court of

Appeals, raising the same claims raised in his motion for relief from judgment.  The

Michigan Court of Appeals denied leave to appeal.  People v. O'Neal, No. 296018

(Mich. Ct. App. Nov. 24, 2010).  Petitioner filed an application for leave to appeal in the

Michigan Supreme Court.  In lieu of granting leave to appeal, the Michigan Supreme

Court remanded the case to the trial court because a corrected judgment of sentence

had not yet been issued.  People v. O'Neal, 488 Mich. 952 (Mich. 2010).  In all other

respects the Michigan Court of Appeals denied leave to appeal.  Id.

Petitioner then returned to this Court and asked that the stay be lifted and the

case reopened.  The Court reopened this proceeding and directed Respondent to file an

answer and supplemental state court record.  See 6/30/15 Order, ECF No. 28.

Respondent filed an answer and Petitioner has filed a reply.  ECF Nos. 29, 31.

The petition raises these claims:

I.     Trial Court Evidentiary Error, Infringing the Fourteenth Amendment Right
       to Due Process.

       A.     Where no discovery order directed the defense to make disclosures
              to the prosecution and, the prosecution made no request for
              disclosure, did the trial court erroneously preclude the defense from
              confronting Parish Hickman with his statement admitting that he
              had gotten away with murder by framing Tyson O'Neal?

       B.     Did the trial court err by precluding the defense from presenting the
              testimony of Sgt. Johnson and Nurse Rupert that Gene Shelby
              said, "Parish Hickman shot me?"

II.    Prosecutorial misconduct

       A.     By arguing that "At 32 I've done just a few too many of these case,"
              did the prosecutor improperly inject issues broader than the guilt or

10

innocence of the accused?

B.    Did the prosecutor improperly vouch for the credibility of his witnesses when he told the jury that these witnesses were honest?

III.    Ineffective assistance of counsel

A.    Defendant was charged as a felon in possession of a firearm. While instructing prospective jurors in this murder prosecution, the trial court told the jury that defendant "Had been convicted of manslaughter, a specified felony." Was trial counsel ineffective by failing to move *in limine* to bar admission of the details of defendant's prior conviction and by failing to move for a new jury panel?

B.    Was trial counsel ineffective for failing to move for a mistrial or, alternatively, requesting a cautionary instruction when Parish Hickman non responsively stated that he had passed a polygraph examination?

C.    Was trial counsel ineffective for failing to seek the appointment of an expert on eyewitness identification and/or an instruction on the grave dangers of eyewitness misidentification based on People v Franklin Anderson?

D.    Was trial counsel ineffective in failing to timely and properly object to the prosecutorial misconduct raised in Issue II of this Brief?

IV.    Defendant was denied his state and federal right of confrontation when no proof was offered at trial to show that Medical Examiner, Dr. Cheryl Loewe, was unavailable to testify and defendant did not have a prior opportunity to cross-examine her, but hearsay evidence was admitted through Dr. Sawait Kanluen's testimony regarding the contents of Loewe's autopsy report (and addendum) and notes which amounted to "testimonial" evidence as defined in Crawford v. Washington.

V.    Trial counsel was ineffective when he failed to present any medical experts on arteriosclerotic cardiovascular disease or an enlarged heart, and failed to call as witnesses medical personnel from the hospital.

VI.    Defendant was denied his State and Federal constitutional right to the effective assistance of counsel where counsel failed to object to the trial court's exclusion of potentially exculpatory evidence and allowed the court to exclude other exculpatory statements from promising witnesses.

VII.    Defendant improperly sentenced as a fourth habitual offender.

VIII.    Appellate counsel was ineffective in failing to raise on direct appeal the claims raised in the motion for relief from judgment.

IX.    Defendant was denied the effective assistance of trial counsel, where counsel failed to move to suppress the identification testimony of key prosecution witness Edward Clark, Henry Patterson, and Shakir Azeem, as the result of an unduly suggestive line-up, where the defendant at 5'6", was not only considerably shorter but also the only dark complected participant.

X.    Defendant O'Neal was denied his constitutional right to the effective assistance of counsel where trial counsel failed to interview and produce at trial Shannon Coleman who was an eyewitness to the shooting incident, and only attempted to secure his presence just prior to the prosecution's closing argument.

### III.  Standard of Review

Petitioner's claims are reviewed against the standards established by the

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

1214 (AEDPA).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam), quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case."  Wiggins v. Smith, 539 U.S. 510, 520 (2003), quoting Williams, 529 U.S. at 413.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'"  Wiggins, 539 U.S. at 520-21 (citations omitted); see also Williams, 529 U.S. at 409.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 102-03 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision.  See Williams, 529 U.S. at 412.  Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).  "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."  Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007) citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003); Dickens v. Jones, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002)).

Lastly, a federal habeas court must presume the correctness of state court factual determinations.  *See* 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.  Discussion

As will be explained below, Petitioner's right to present a defense was violated when the trial court excluded testimony about the victim's hospital statement identifying Hickman as the shooter and Parish Hickman's statement that he framed Petitioner.  The state court's denial of these claims was an unreasonable application of Chambers v. Mississippi, 410 U.S. 284 (1973).  Further, the error was not harmless.

First, Petitioner challenges the exclusion of Shelby's hospital statement identifying Parish Hickman as the shooter, which defense counsel attempted to

14

introduce through a police officer and nurse.  Defense counsel sought to introduce

police officer Pride Johnson testimony that, when asked at the hospital who had shot

him, Gene Shelby responded, "Parish shot me," and registered nurse Earl Rupert's

testimony that he heard Shelby tell Officer Johnson, "Parish shot me."   Doc. 15-2, Pg.

ID 769-70.  Defense counsel offered the testimony under Michigan Rule of Evidence

804(b)(7), Michigan's "catch-all" exception to the hearsay rule which permits hearsay

not specifically covered by any other exception to the hearsay rule if the evidence has

equivalent circumstantial guarantees of trustworthiness.  The trial court excluded the

statement under state rules of evidence because it was unreliable:

> [T]he circumstances under which the statement were given, were – I think
> it's commonplace unreliable.  He's being treated by doctors, he's probably
> been given medication.  People who are under medication rave and state
> all kinds of things.  So that doesn't make this statement trustworthy.  And
> therefore, I would not allow it in. ... I rule the same way [with respect to
> Earl Rupert's testimony].

Doc. 15-2, Pg. ID 771.

On direct appeal, Petitioner argued that the trial court's exclusion of this

testimony violated his constitutional right to present a defense.  The Michigan Court of

Appeals affirmed the trial court's decision, stating, in relevant part:

> Because the victim had been shot and was likely medicated at the
> hospital, because four people testified at trial that Hickman was on the
> driver's side of the car when the passenger door opened and the
> passenger emerged with a gun, and because three people identified
> defendant as the passenger and shooter, we conclude that the trial court
> was justified in concluding that Shelby's statement was untrustworthy.

O'Neal, 2004 WL 2072070 at *2.

The Michigan Court of Appeals held that the exclusion of Officer Johnson's and

Rupert's testimony was not contrary to Michigan Rules of Evidence.  That conclusion

15

does not end this Court's inquiry because it does not resolve the question whether the exclusion of this evidence violated Petitioner's right to present a defense.[2]

A criminal defendant has a federal constitutional right to present a defense. Chambers v. Mississippi, 410 U.S. 284 (1973). This right has long been recognized as "a fundamental element of due process of law," Washington v. Texas, 388 U.S. 14, 19 (1967), and is one of the "minimum essentials of a fair trial." Chambers, 410 U.S. at 294. But the Supreme Court also recognizes that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Nevada v. Jackson, 569 U.S. 505, 509 (2013) (internal quotation omitted). A defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissable under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." United States v. Scheffer, 523 U.S. 303, 308 (1998) (internal quotation omitted). The exclusion of evidence has been found to be "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Id.

---

[2] The parties did not address the Michigan Court of Appeals' failure to specifically address this claim as a federal constitutional claim. The state court's discussion focuses on state evidentiary rules. Nevertheless, the deferential standard set forth in § 2254(d) presumptively applies even where the state court deciding a federal claim "issues an opinion that ... does not expressly address the federal claim in question." Johnson v. Williams, 568 U.S. 289, 292 (2013). "[T]he federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." Id. at 293. Petitioner has not attempted to rebut the presumption that the state court implicitly rejected Petitioner's constitutional claim on the merits. The Court accordingly applies a deferential standard of review.

The constitutional right to defend may take precedence over rules of evidence under certain circumstances.  In <u>Chambers v. Mississippi</u>, 410 U.S. 284, 285 (1973), the defendant was charged with the fatal shooting of a police officer during a chaotic disturbance involving fifty to sixty individuals outside a bar.  Another man, Gable McDonald, was also at the scene of the shooting and several days after the shooting gave a signed confession to Chambers' attorneys admitting that he shot the police officer.  <u>Id.</u> at 287.  He also confessed to several other individuals.  One month later at a preliminary hearing and later at Chambers' trial, McDonald recanted his written confession.  <u>Id.</u> at 288-289.  Chambers called McDonald as a witness at trial. McDonald's written confession was admitted into evidence, but McDonald again repudiated it.  <u>Id.</u> at 291.  The court did not allow the defendant to call other witnesses to whom McDonald had confessed because those confessions were hearsay, and Mississippi did not have an exception for statements against penal interest.  <u>Id.</u> at 292–93, 299.  Chambers was convicted of murder.

The Mississippi Supreme Court affirmed the trial court's rulings, but the Supreme Court reversed, holding that the hearsay statements should have been allowed.  <u>Id.</u> at 293, 302.  The Court noted that declarations against interest have long been treated as sufficiently reliable to be excepted from rules against hearsay.  <u>Id.</u> at 298-99. The Court found that the excluded confessions "bore persuasive assurances of trustworthiness" that brought them "well within the basic rationale of the exception for declarations against interest" and were "critical to Chambers' defense."  <u>Id.</u> at 302. The Court concluded: "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied

17

mechanistically to defeat the ends of justice." Id.  The combination of the limits on impeachment and the exclusion of the confessions led the Court to hold that "under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." Id. at 303.

In this case, the excluded testimony was highly relevant to a critical issue – the identity of the shooter.  Its exclusion denied Petitioner of a fair trial.  The state court's decision that Shelby's statement that Hickman shot him was untrustworthy is an unreasonable conclusion based upon the evidence before the court.  Substantial reasons existed to assume the reliability of the statement.  First, Shelby had no known motive or justification for exonerating Petitioner.  Second, corroborating evidence supported the reliability of this statement including Shelby's earlier statement to Azeem on the way to the hospital identifying Hickman as the gunman, Hickman's statement to a jailhouse informant that he had framed Petitioner and gotten away with murder, and Patterson's initial statement to police identifying Hickman as the shooter.  See Chambers, 410 U.S. at 300-01 (finding reliability of hearsay statement supported by corroborating evidence).  Third, there was no allegation that either Officer Johnson or nurse Rupert misunderstood Shelby's statement.

Finally, the state court's finding that the statement was untrustworthy is based upon pure conjecture that Shelby "was probably highly medicated at the hospital." O'Neal, 2004 WL 2072070 at *2 (emphasis supplied).  There is no record evidence that Shelby was either highly medicated or that his cognitive function was impaired by medication.  The record before the Court shows that in the emergency room Shelby received a tetanus shot, an antibiotic (Ancef), and morphine for pain.  Doc. 30-2, Pg. ID

18

1241.  The Sixth Circuit Court of Appeals has held that a declarant's being in pain and having received morphine do not, without more, show impairment.  United States v. Montgomery, 621 F.3d 568, 574 (6th Cir. 2010).  The medical records show that prior to surgery, medical professionals discussed with Shelby the benefits, potential risks and complications of surgery and that Shelby gave his informed consent.  Id. at Pg. ID 1243. That medical professionals deemed Shelby capable of giving informed consent supports a finding that his cognitive function was not significantly impaired.

The state courts' decisions that Shelby's statement was untrustworthy was based upon nothing more than an assumption about the medication he may have received at the hospital and its probable impact on his cognitive function.  The contested testimony in this case was critical to the defense, it bore persuasive assurances of trustworthiness and directly affected the ascertainment of Petitioner's guilt.  The exclusion of this evidence infringed upon Petitioner's right to present a defense and the state court's decision to the contrary was an unreasonable application of Chambers.

Errors implicating a defendant's right to present a defense are subject to harmless-error analysis.  See Fleming v. Metrish, 556 F.3d 520, 536-37 (6th Cir. 2009). Generally, courts on collateral review must "give a heightened degree of deference to the state court's review of a harmless error decision."  Langford v. Warden, 665 Fed. App'x 388, 389 (6th Cir. 2016), citing Davis v. Ayala, 576 U.S. —, 135 S. Ct. 2187, 2197 (2015).  But where, as here, the state court did not conduct a harmless error review, there is no state-court harmless-error determination to which the Court must grant deference.  Langford, 665 Fed. App'x at 389 (6th Cir. 2016).  The Court thus conducts

19

an independent review of the harmlessness of the error.[3]

The exclusion of this testimony deprived Petitioner of presenting evidence that someone other than himself, Hickman, was the shooter.  Azeem's testimony that Shelby told him on the way to the hospital that Hickman was the shooter did not render Officer Johnson's and Nurse Rupert's testimony unnecessary.  Officer Johnson and Nurse Rupert were both neutral parties who had no involvement with the motorcycle club, no beef with Petitioner or Hickman, and no relationship with Gene Shelby. Their testimony would have bolstered and given weight to Azeem's.  It would have supported a finding that Shelby's statement to Azeem was not the result of him mis-speaking or Azeem misunderstanding Shelby.  It is true that three witnesses identified Petitioner as the shooter, but one of those witnesses, Patterson, told police at the scene that Hickman was the shooter.  Patterson identified Petitioner from a lineup in July 2002, approximately a year and a half after the shooting.  During that extended time period, he certainly had time to confer with Azeem and Clark.  Notably, the only eyewitness who did not identify Petitioner in the lineup, Dorshell Wilkerson, was the only eyewitness who had no connection to the motorcycle club.  Wilkerson also told police immediately following the shooting that, as Hickman walked toward his vehicle his hands were in his

---

[3]  This approach, addressing the harmlessness review de novo when the state court found no error and therefore never undertook a harmless error review, is also in accord with the Sixth Circuit's approach to the two-prong analysis of ineffective assistance of counsel claims under Strickland v. Washington, 466 U.S. 668 (1984). When a state court addressed just one of the two Strickland prongs, a federal court on habeas review affords AEDPA deference to the prong addressed by the state court, but conducts a de novo review of the prong not reached by the state court.  See Moss v. Olson, 699 Fed. App'x 477, 481-82 (6th Cir. 2017); Hodges v. Colson, 727 F.3d 517, 537 (6th Cir. 2013).

pockets as if he might have been armed with a gun.

There was substantial evidence implicating Petitioner in this crime.  But the jury was not permitted to hear substantial evidence which would have implicated Hickman as the shooter.  The testimony that Shelby identified Hickman as the shooter again at the hospital coupled with Parish Hickman's own improperly excluded statement (discussed below) that he framed Petitioner leaves this Court in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'"  O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  The error was not harmless.

The Court next considers the trial court's exclusion of Parish Hickman's alleged statement to Duane Wilson.  The Michigan Court of Appeals found the testimony was improperly excluded, but that the error was harmless.  Where, as here, the state court adjudicated the issue of harmless error, on the merits, " 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.'"  Ayala,576 U.S. at — , 135 S.Ct. at 2199, quoting Fry v. Pliler, 551 U.S. 112, 119 (2007).  This Court gives a "heightened degree of deference to the state court's" harmless error decision.  Langford, 665 Fed. App'x at 389, citing Ayala, 576 U.S. —, 135 S. Ct. at 2197.

The Michigan Court of Appeals explained its harmless error analysis as follows:

Where four people testified that Hickman was on the driver's side of the car when the passenger emerged from the other side with a gun, and three people identified defendant as the passenger and shooter, we find beyond a reasonable doubt that a rational jury would have found defendant guilty even if defendant had been permitted to confront Hickman with the alleged statement.  Thus, we find the exclusion of the statement harmless.

21

*O'Neal*, 2004 WL 2072070 at*1.

The Court finds the state court's harmless error analysis unreasonable. Hickman had substantial motive to implicate Petitioner. Hickman was indisputably present at the crime scene, had a long-standing beef with Shelby, and a confrontation with him moments before Shelby was shot. He left the gas station to retrieve an AK 47 and with an expressed intent to confront Shelby. Hickman fled the country after the shooting. Hickman also benefitted from a three to fifteen year plea deal for his testimony against Petitioner. In light of all of these considerations, at a minimum, the Court has "grave doubt about whether" the trial court's erroneous exclusion of testimony that Hickman purportedly admitted to getting away with murder himself and framing Petitioner "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The error was not harmless.

## V. Conclusion

Petitioner was denied his constitutional right to present a defense. As a result, he was denied the opportunity to present to the jury evidence that Shelby identified Parish Hickman as the shooter and that Hickman himself admitting to getting away with murder and to framing Petitioner. The error was not harmless.

Accordingly, the petition for a writ of habeas corpus is CONDITIONALLY GRANTED. Unless a date for a new trial is scheduled within 120 days, Petitioner must be unconditionally released. Because the Court concludes that the Petitioner's right to present a defense claim warrants habeas corpus relief, the Court need not address Petitioner's remaining claims at this time.

SO ORDERED.

**CODA**

This decision came after a lot of effort.  A large portion of that effort came from the Staff Attorneys Office.  Staff Attorneys began as a pilot project in 1975 and became a formal part of the federal courts in 1981 after the Judicial Conference approved of their creation.  See Report of the Proceedings of the Judicial Conference of the United States (Washington D.C., Sept. 24-25, 1981); Peter Charles Hoffer, William James Hull Hoffer, N.E.H. Hull, The Federal Courts, An Essential History 421 (Oxford University Press 2016).  The Court recognizes the hard work of the Staff Attorneys in the assistance of the administration of justice.

S/Avern Cohn<br>
AVERN COHN<br>
UNITED STATES DISTRICT JUDGE

Dated: 9/18/2018
        Detroit, Michigan